IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

KIMBERLY HUNT-BROWN,

    Plaintiff,

  vs.        NO: 23-CV-00782 SMD-KK

NEW MEXICO GENERAL
SERVICES DEPARTMENT, and
VALERIE PAULK, EUNICE
MOYA, JENNIFER MORFIN,
VANESSA LEBLANC, AND
NATALIE MARTINEZ, in their
individual capacities,

    Defendants.

DEPOSITION OF EUNICE MOYA
March 7, 2025
9:04 a.m.
119 E. Marcy, Suite 110
Santa Fe, New Mexico

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: HEATHER BURKE
    Attorney for the Plaintiff

REPORTED BY: Robin A. Brazil, RPR, NM CCR #154
    Bean & Associates, Inc.
    Professional Court Reporting Service
    201 Third Street, Northwest, Suite 1950
    Albuquerque, New Mexico  87102

(421P) RAB

Page 74

1  A. That was a follow-up to our meeting on
2  July 31st.
3  Q. What happened at that meeting?
4  A. Ms. Brown was notified that she would have
5  to return back to the office August 30.
6  Q. Had you notified Ms. Hunt-Brown before
7  that meeting that she couldn't be accommodated?
8  A. I may have through email. I can't recall.
9  I think it was probably a few days before letting
10 the -- her know that the state personnel office
11 rescinded the telework agreement policy, but I --
12     (Exhibit 26 marked.)
13 Q. Exhibit 26 is the nonmandatory telework
14 policy for the general services department. Is this
15 the policy we were just talking about?
16 A. Yes.
17 Q. And what date was that rescinded?
18 A. February -- I don't remember the exact
19 date. February 2023, but I just can't remember.
20 The 7th? I don't recall. Originally it was in -- I
21 believe it was in November an email went out that
22 all employees were to report back to work in
23 January, and then there was union negotiations back
24 and forth, and so they agreed upon a date of
25 February.

Page 75

1  Q. Okay. Looking at page three of this
2  document that says GSD 24 on it. Sorry, page five,
3  which is 26.
4     4.14 says: Request for leave under the
5  Family Medical Leave Act or reasonable
6  accommodations under the Americans with Disabilities
7  Act, as amended or not governed by this policy.
8  Such requests are governed by general service
9  department FMLA policy and the ADA policy
10 respectively.
11     Is that what that says?
12 A. Yes.
13 Q. So how does this policy being rescinded
14 and no longer existing affect requests for
15 accommodation?
16 A. Because prior to this going into effect,
17 telework was never an accommodation under ADA with
18 general services department.
19 Q. So if you recall at the meeting that we
20 had on the 31st of July, I told you I personally was
21 accommodated with telework by the general services
22 department during my cancer treatment before this
23 policy existed, because telework was a reasonable
24 accommodation, and we discussed that.
25 A. I don't recall you talking about yourself.

Page 76

1  I do recall the meeting, but I don't recall you
2  saying that.
3  Q. Okay.
4  A. I just recall you saying that you did sue
5  the general services department.
6  Q. So why would telework not be considered a
7  reasonable accommodation by the general services
8  department?
9  A. Well, when I was -- when I started -- that
10 was -- their policy was never before. I'm not sure
11 what happened.
12     Again, before -- before I was there, I
13 can't answer that question.
14     (Exhibit 27 marked.)
15 Q. Exhibit 27 is the MOU that you just -- is
16 this one of the MOUs that you referred to about the
17 union negotiations on the return to work?
18 A. Yes.
19 Q. And does number three specifically state
20 that any return to work doesn't apply to reasonable
21 accommodations?
22 A. Yes.
23 Q. So why would the telework policy being
24 rescinded mean that there was no reasonable
25 accommodation provided for telework?

Page 77

1  A. It was based on the guidance from the
2  state personal office.
3  Q. The same state personnel office that
4  signed that agreement with the union, saying it
5  didn't apply to requests?
6  A. Yes.
7  Q. So why would they guide you -- why do you
8  believe that they would guide you to not accommodate
9  people with telework if they had just signed an
10 agreement with the unions saying that their
11 rescission of the nonmandatory telework policy
12 didn't apply?
13 A. Because they left it to the discretion of
14 the employer, GSD, the agency.
15 Q. So it wasn't state personnel office; it
16 was GSD's own personal decision?
17 A. Based under guidance, yes.
18 Q. But they left it up to you to decide?
19 A. Yes.
20 Q. And you decided not to accommodate
21 Ms. Hunt-Brown with telework; is that correct?
22 A. Correct.
23     (Exhibit 28 marked.)
24 Q. Exhibit 28 is an accommodations request
25 form by Ms. Hunt-Brown, submitted on August 4th,

**Page 78**

1  2023.
2      Is this the accommodations request for
3  Ms. Hunt-Brown's accommodation for her migraines?
4      A.  Yes.
5      (Exhibit 29 marked.)
6      Q.  Do you recall we talked about
7  Ms. Hunt-Brown's migraines in the July 31st meeting?
8      A.  Yes.
9      Q.  Okay.  Exhibit 29 is a physician's
10  statement that accompanied Exhibit 28.  Are you
11  familiar with this physician statement?
12      A.  Yes.
13      Q.  On page three of this document, which is
14  GSD 180, at the top of the page it says suggested
15  accommodations, and the suggested accommodations was
16  to allow Kimberly to take her work laptop home each
17  evening.  If she awakens with a migraine, allow her
18  to work from home, parentheses, VPN telework,
19  beginning after headache symptoms diminish,
20  typically no later than midday.
21      Did Ms. Hunt-Brown's physician request
22  that she be allowed to telework part-time after
23  having a migraine?
24      A.  Yes.
25      Q.  What was the basis for GSD's denial of the

**Page 79**

1  physician's suggested accommodation?
2      A.  We can accommodate an employee while
3  they're in the office under alternative
4  recommendations for accommodation.
5      Q.  What do you mean you can accommodate while
6  they're in the office?
7      A.  When an employee accepts the position,
8  they were notified that the position was in the
9  office Monday through Friday, 8:00 to 5:00 -- I'm
10  not sure at that point in time when Ms. Hunt-Brown
11  was hired there was an alternative work schedule.  I
12  don't know the policy that far back.
13      So when an employee is in the office, we
14  can accommodate them while they're in the office.
15      Q.  Okay.  Because that made Ms. Hunt-Brown
16  being in the office an essential function of her
17  position; did it not?
18      A.  Yes.
19      Q.  And the point of a reasonable
20  accommodation is to assist Ms. Hunt-Brown performing
21  the essential functions of her position, correct?
22      A.  Correct.
23      Q.  And so if an essential function of her
24  position is to be able to be in the office, an
25  accommodation to that essential function of telework

**Page 80**

1  allowing her to virtually be in office would be a
2  reasonable accommodation of the essential
3  requirement to be in the office, correct?
4      A.  No.
5      Q.  Why?
6      A.  Because we do not allow telework.
7      Q.  GSD just doesn't allow telework no matter
8  what?
9      A.  That's what I said.
10      Q.  Nobody at GSD ever teleworks?
11      A.  I can't say that.
12      Q.  But you would know, correct?
13      A.  No, because a work schedule -- a work
14  schedule is between an employee and supervisor.  The
15  only way I would know is if there was an
16  accommodation request that came through HR.
17      Q.  So you would only know if it's a
18  reasonable accommodation --
19      A.  Correct.
20      Q.  -- not if nondisabled people were allowed
21  to telework?
22      A.  I don't know that.
23      Q.  But GSD has never reasonably accommodated
24  somebody with telework?
25      A.  There was a slew of them around the same

**Page 81**

1  time that your client was approved for.
2      Q.  And you denied all of those?
3      THE WITNESS:  Do I answer that?
4      MR. LOMAN:  You can answer that.
5      A.  They were given the same accommodation,
6  the six-month, and then at that time they were asked
7  to come back to the office.
8      Q.  But wasn't the accommodation for six
9  months for COVID issues, with being high risk?
10      A.  No.  It was whenever the accommodation was
11  requested to work from home.
12      Q.  So you looked at the request -- what
13  was -- you looked at what was being requested, not
14  why it was being requested?
15      A.  Yes, what was -- why -- wait.  No.  Ask me
16  that question again.  I'm sorry.
17      Q.  So when you extended the telework for
18  people, you extended it based on the fact that you
19  were extending telework, not that somebody had a
20  specific need for telework?
21      A.  No.  I based it on the medical
22  certification, not based on telework.  Not on -- not
23  on the -- not on the first part that you said.
24      Q.  So looking back at Exhibit 29, the medical
25  certification suggests that the accommodation for

Page 86

1  migraines, correct?
2     A.  I don't know about for her migraines, but
3  she did ask for the paperwork.
4     Q.  Did she say that, that she was wanting to
5  revise her request for her migraines?
6     A.  Yes.
7     Q.  This was before our meeting on July 31st,
8  correct?
9     A.  Uh-huh.
10    Q.  But at the top of this page you already
11 tell Ms. Hunt-Brown that GSD is unable to
12 accommodate her telework schedule.  So you're
13 already denying her request for accommodation prior
14 to the interactive process meeting.  Why is that?
15    A.  Due to the rescission of the telework.
16    Q.  Why have an interactive process meeting to
17 discuss accommodations if you've already flatly
18 denied them?
19    A.  Because we were going to talk about how we
20 could accommodate Ms. Hunt-Brown while she was in
21 the office.
22    Q.  And at that meeting we did talk about her
23 migraines, but we didn't talk about her COVID risk;
24 did we?
25    A.  No.

Page 87

1     Q.  Had you asked Ms. Hunt-Brown if she
2  intended to continue seeking the same accommodation
3  before you decided you were going to deny it?
4     A.  One more time.
5     Q.  Had you talked to Ms. Hunt-Brown about
6  whether or not she was going to continue her
7  previous accommodation before you decided that you
8  were denying it?
9     A.  No.
10    Q.  Did you have any updated paperwork before
11 the interactive process meeting?
12    A.  No.
13    Q.  So you set an interactive process meeting
14 without actually asking for another accommodation
15 form first?
16    A.  This meeting was to notify -- formally
17 notify Ms. Hunt-Brown that there is no more
18 telework, and all telework accommodations were going
19 to be rescinded.  That's what my intent was.
20    Q.  Based on the rescission of the policy that
21 didn't provide reasonable accommodation requests,
22 correct?
23    A.  Correct.
24    Q.  This was GSD's own decision that it was
25 just not going to allow telework at all anymore,

Page 88

1  correct?
2     A.  Yes.
3        (Exhibit 31 marked.)
4     Q.  Exhibit 31 is a letter from Eunice Moya to
5  Kimberly Hunt-Brown, sent on August 4th.  This is
6  different than the previous letter we discussed.
7     A.  Uh-huh.
8     Q.  What is this -- are you familiar with this
9  letter, Ms. Moya?
10    A.  Yes.
11    Q.  What is this letter?
12    A.  This is notifying her we were unable to
13 accommodate the telework schedule due to the
14 rescission of the telework policy.
15    Q.  And this was sent the same day
16 Ms. Hunt-Brown submitted her formal request for
17 accommodation for her migraines, correct?
18    A.  Correct.
19    Q.  August 4th, did you have another
20 interactive process meeting?
21    A.  No.
22    Q.  And you decided the same day that
23 Ms. Hunt-Brown's accommodation request was not a
24 suitable accommodation?
25    A.  Based on the policy.

Page 89

1     Q.  Your own policy to not telework -- grant
2  telework?
3     A.  GSD's.
4     Q.  You are GSD's HR director, correct?
5     A.  Yes.
6     Q.  So GSD decided that no matter what any
7  doctor requested for any employee, there would be no
8  telework?
9     A.  Correct.
10    Q.  Looking back at Exhibit 1 on page four of
11 the document, not including -- I guess that's five
12 including the cover page.  7.3, the determinations
13 as we discussed earlier today.
14       GSD makes determinations about reasonable
15 accommodations on a case-by-case basis.  Various
16 factors, based on an individualized assessment, are
17 considered in each situation.
18       How is your decision to not grant any
19 telework to anybody no matter what compliant with
20 this provision of the policy?
21    A.  Because we accommodate an employee while
22 they're in the office.  We accommodate them to
23 perform their essential functions while they're in
24 the Joseph Montoya Building or T187 building,
25 wherever these employees are located.

Page 90

1   Q. Right. We've already talked about that,
2   and we agreed as an essential function of
3   Ms. Hunt-Brown's position, being in the office would
4   be something that could be accommodated under this
5   policy to help her still be in the office when she
6   can't physically be there.
7   A. Yeah, there was no telework accommodation.
8   Q. So you're not complying with this
9   provision, because there's no individualized
10  assessment at all. There's a blanket policy to not
11  grant telework, correct?
12  A. Telework.
13  Q. Right. But so there's no individualized
14  assessment at all, because it doesn't matter who
15  asks and why, you just don't grant telework no
16  matter what.
17  A. Correct.
18  Q. And you believe that that is compliant
19  with the ADA and New Mexico Human Rights Act?
20  A. To the best of my knowledge, yes.
21  Q. Does this make Ms. Hunt-Brown take off
22  additional work that she didn't otherwise need to
23  take off?
24  A. Based on her -- I believe so. I don't
25  know. I don't know what -- I don't know.

Page 91

1   Q. So if she can't drive to the office
2   because of the medication she's taking, but she
3   feels better and is able to work, but she can't
4   telework, that means she can't work those hours,
5   right, so she has to be absent for hours that she
6   could otherwise work if she could drive, right?
7   A. Right.
8   Q. So does this hurt GSD to have employees
9   not working when they could otherwise work?
10  A. I don't know.
11  Q. Do you think that it interferes with
12  somebody's FMLA to force them to take FMLA leave
13  that they don't otherwise need because they're not
14  being accommodated?
15  A. I don't know.
16  Q. Isn't it your job to know these laws?
17  A. Yes.
18  Q. Why does GSD require somebody to submit
19  medical certification for request for accommodation
20  if they're not going to even consider the
21  recommended accommodation?
22  A. Like I said earlier, based on performing
23  the essential functions in the office is where we
24  can accommodate.
25  Q. Right, but you can't accommodate the

Page 92

1   essential function of being in the office, correct?
2   A. No, because it is the employee's
3   obligation to find a way to get to the office. It's
4   not on the employer.
5   Q. It's not on the employer to help an
6   employee perform the essential functions of their
7   position?
8   A. No, I didn't say that, but it's not an
9   employer's job to figure out how they're going to
10  get from home to the office.
11  Q. Is Ms. Hunt-Brown asking you guys to
12  provide a taxi for her?
13  A. No.
14  Q. Is she asking you to virtually allow her
15  to be in the office through telework?
16  A. Yes.
17  Q. Did you allow people to virtually be in
18  the office for telework during the COVID pandemic?
19  A. Yes.
20  Q. Because people can perform the essential
21  functions of their position that way, correct?
22  A. Mostly.
23  Q. What essential functions of
24  Ms. Hunt-Brown's position can she not achieve doing
25  that?

Page 93

1   A. I don't know.
2   Q. So in your first letter that you sent
3   where you identified her working from her office and
4   said that a reasonable accommodation would be to
5   allow her to remotely attend meetings from her
6   office in the building, how is that different than
7   her remotely attending meetings from her office at
8   home?
9   A. Because there's no telework.
10  Q. Okay. So it's just telework? There's not
11  any -- there's not any reason behind it? It's just
12  the idea of telework is just not allowed?
13  A. Correct.
14  Q. And you said this was your decision to
15  just not allow telework?
16  A. It was the agency's decision.
17  Q. You, as HR director, make that decision,
18  or can somebody tell you to make that decision?
19  A. It was based on leadership, GSD
20  leadership.
21  Q. So somebody told you --
22  A. Correct.
23  Q. -- or you decided yourself?
24  A. No, I did not decide myself.
25  Q. Okay. Who told you?

Page 94

1  A. It was our cabinet secretary and our
2  general counsel.
3  Q. And they decided that GSD would never
4  accommodate anybody through telework?
5  A. Correct.
6  Q. Despite their agreement with the union,
7  the state's agreement with the union?
8  A. With -- based on general counsel from the
9  state personnel office guidance with our general
10 counsel, correct.
11 Q. Since August 4th have you engaged with
12 Ms. Hunt-Brown to determine whether or not she needs
13 any accommodations or if there's anything else that
14 can be done to assist her performing the essential
15 functions of her position?
16 A. No.
17 Q. Why not?
18 A. Because she -- I don't believe that she's
19 come to my office or to me personally, and I can't
20 speak on the -- on the behalf of the consultants,
21 because I'm not sure whether there's been
22 communication.
23 Q. So you denied her request for
24 accommodation outright on August 4th and then never
25 followed up to have another interactive process

Page 95

1  meeting?
2  A. No.
3  Q. Even though earlier today you talked about
4  the fact that sometimes you have two interactive
5  process meetings, correct?
6  A. Correct.
7  Q. Why did you not have a second one in this
8  case?
9  A. I can't say. I don't -- no reason.
10 Q. Who was the secretary of GSD at the time
11 this decision was made?
12 A. I believe it was Anna Silva or Robert --
13 Robert Doucette. Robert Doucette.
14 Q. Is he still the secretary?
15 A. No.
16 Q. When did he leave?
17 A. He left in -- on January 31st.
18 Q. Of this year?
19 A. Yes.
20 Q. What is your understanding of what the
21 ADA's requirement to have an interactive process
22 meeting is?
23 A. For both parties to get together and to
24 come to an agreement with a reasonable accommodation
25 to perform the essential functions of the job.

Page 96

1  Q. And is that with the intent of problem
2  solving and trying to figure out solutions to any
3  impediments to a disabled worker's performance?
4  A. Yes.
5  Q. But you chose not to do that for
6  Ms. Hunt-Brown?
7  A. We did have one.
8  Q. You had one in which you had already told
9  her you weren't going to grant telework, and then
10 you got her paperwork from her doctor saying that
11 they thought telework was the best way to
12 accommodate this, and you said no, and then you
13 didn't do any more?
14 A. Correct.
15 Q. So you knew that she still wasn't being
16 accommodated at all, correct, because there's not --
17 on this second letter, there's not any even
18 alternative suggestions of what she could do,
19 correct?
20 A. No, we just based it on that first letter
21 I sent in.
22 Q. And obviously those alternate
23 accommodations that were suggested for an
24 accommodation she was not seeking wouldn't apply to
25 her accommodation needs for a migraine; would they?

Page 97

1  A. I don't know.
2  Q. Would telework --
3  A. Based on what the medical -- the medical
4  provider said, they wouldn't.
5  Q. Okay. Thank you. So would it be
6  considered retaliation under GSD's -- both their
7  accommodations policy and their antiretaliation
8  policy to just leave a worker who's notified you of
9  a need for accommodations with no accommodations at
10 all?
11 A. I don't think it would.
12 Q. Why not?
13 A. Because we weren't -- or I wasn't trying
14 to cause any undue hardship to Ms. Hunt-Brown.
15 Q. But you knew she needed an accommodation,
16 and you didn't provide anything to her, correct?
17 A. I provided the three on the letter.
18 Q. For the ones she wasn't seeking. Those
19 ones are targeted for her previous high-risk COVID
20 assessment, correct?
21 A. Correct.
22 Q. But that because of changes in
23 vaccinations and all of that, she no longer needed,
24 because her doctors apparently felt that her
25 high-risk status wasn't as much an issue, you know,