**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**KIMBERLY HUNT-BROWN**

**Plaintiff,**

**vs.**                                                                    **Civ. No. 23-cv-00782 SMD-KK**

**NEW MEXICO GENERAL SERVICES DEPARTMENT,**

**And VALERIE PAULK, EUNICE MOYA, JENNIFER MORFIN,**

**VANESSA LEBLANC, AND NATALIE MARTINEZ,**

**In their individual and official capacities**

**Defendants.**

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS MOTION FOR
SUMMARY JUDGMENT**

COMES NOW, Plaintiff Kimberly Hunt-Brown, by and through her counsel of record,

Heather Burke with her Response in Opposition to Defendants' Motion for Summary Judgment.

**Defendants' Alleged Material Facts**

1. This fact is improperly compound, includes multiple facts in violation of

   D.N.M.LR.56.1 and is impossible to properly answer. It is both irrelevant and denied.

2.  Not material.  Dispute – the evidence cited does not prove that Martinez started in

   Spring 2020, only that she started after Terese Montoya left.

3. Admit, Plaintiff was put on an unofficial performance improvement plan because she

   was not getting her work duties done as quickly as her comparators who were not

   taking FMLA leave.

1

4. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer.  Plaintiff admits that Defendant Martinez took a leave of absence but disputes that this was the only time she was supervised and/or managed by Paulk. [Plaintiff's 3rd Declaration]

5. Admit

6. Not material.  Admit, sometimes they were helpful.

7. Not material.  Admit.

8. Not material.  Admit.

9. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. DISPUTE – Plaintiff is on an informal Performance Improvement Plan.  [Ex 1 Vanessa LeBlanc Depo pg 36 ln 19 – pg 38 ln 13]  [Plaintiff's 3rd Declaration]

10. DISPUTE Plaintiff was placed on an informal Performance Improvement Plan, and, unlike her coworkers, is required to meet with her supervisor on a weekly basis, unlike her coworkers.  [Ex 1 Vanessa LeBlanc Depo pg 36 ln 19 – pg 38 ln 13]  [Plaintiff's 3rd Declaration]

11. Dispute.  Plaintiff is also suing Eunice Moya, NMGSD, and Jennifer Morfin.

12. DISPUTE.  Plaintiff has been marked AWOL and Plaintiff has been denied promotion multiple times, and has lost pay as a result of Defendants' actions.  [Plaintiff's 3rd Declaration]

13. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer.  DISPUTE.  Plaintiff worked

2

with both Kelly Howley and her supervisor, Eunice Moya, on her recertification. [Plaintiff's 3rd Declaration] [Doc. 99 Ex 4]

14. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. DISPUTE. Plaintiff's FMLA certification was unlawfully rejected and delayed when Defendant Moya and Kelly improperly required a specific medical diagnosis on the certification, which is unlawful. Even after Plaintiff resubmitted her certification, it was again unlawfully denied. [Doc. 99 Ex 4] This was completely the fault of GSD, and they admit that they shouldn't have denied her certification. [Doc. 99 Ex 3] [Doc. 99 Ex 18]

15. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. DISPUTE. Plaintiff was told she could no longer "invoke" FMLA and had to use LWOP. Moya directed Howley to change her time from FMLA to unprotected. Plaintiff was marked LWOP and AWOL and denied the use of her paid leave on March 1, 2023. These codes were not entered by Plaintiff but by Defendant Paulk, who testified it was on advice of HR. [Plaintiff's 3rd Declaration] [Doc 99 Ex 4 pgs 2 and 3]

16. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. DISPUTE. Plaintiff retained a lawyer, who sent a letter on March 2 after Plaintiff's certification had been rejected several times. [Plaintiff's 3rd Declaration] After continuing to unlawfully deny Plaintiff's leave Defendants finally admitted that Plaintiff's certification had been correct since January 17. [Doc. 99 Ex 18] Without asking Plaintiff, they retroactively

designated her leave, in violation of the law since Plaintiff was harmed by their failure to designate her leave.  29 C.F.R. § 825.301(d)

17. DISPUTE.  Plaintiff had paid leave available for her March 1 absence, but was marked LWOP and AWOL because her husband gave notice.  Even after retroactive designation, she was prevented from using paid leave on several dates. [Ex 2]  Plaintiff was prejudiced by Defendants violations. [Plaintiff's 3rd Declaration]

18. Admit

19. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer.  DISPUTE.  Defendants do not cite to evidence in support of this fact.  Plaintiff cannot testify as to Defendant's belief. Defendants arbitrarily began using Plaintiff's provider's estimate as a strict limitation without any legal basis and when they had never done so before, including in February 2024.  Plaintiff was DENIED FMLA leave for her qualifying absences, and denied the use of available paid leave.  [Doc. 99 Ex 22]

20. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer.  DISPUTE.  Defendant Morfin told Plaintiff she had to "submit a new FMLA application" for more leave.  [Doc. 99 Ex. 20 pg 2]  Defendant Morfin's email stating "polite reminder" was the first time Plaintiff was told she could take no more than 4 FMLA absences in a month. [Plaintiff's 3rd Declaration]

21. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. DISPUTE.  At the end of April, after Plaintiff had been able to see her provider to get a recertification, Defendants

4

finally stopped unlawfully denying her FMLA leave.   DISPUTE   Plaintiff was forced to take LWOP and denied the use of her donated paid leave while simultaneously being denied FMLA.  [Doc. 99 Ex 21]  [Plaintiff's 3rd Declaration]

22. DISPUTE.  FMLA can be paid or unpaid, depending on the substitution of other available leave, used in conjunction with FMLA. [Ex 3 FMLA Policy] LWOP, as the name suggests, is always unpaid.

23. Not material, admit.

24. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. DISPUTE.  Plaintiff was approved on a "trial basis" for a period between February 2 and August, when her need for accommodation would be reevaluated.  She did not apply for another full time telework accommodation. [Plaintiff's 3rd Declaration]

25. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. DISPUTE.  Not material and contains factual information not known to Plaintiff and not supported otherwise. Plaintiff has no knowledge of other people's accommodations, and yet they cite to her testimony as though she does.

26. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer.  DISPUTE.  Plaintiff was granted an accommodation to telework, not an "extension." [Plaintiff's 3rd Declaration] This is false and the cited testimony doesn't support it.  Plaintiff never submitted a new request to continue teleworking for COVID sensitivity. [Plaintiff's 3rd Declaration]

27. DISPUTE.  Plaintiff notified Defendant Moya via email on July 28, 2023 that she was seeking a new part time accommodation for her migraines.  Defendants denied the accommodation the interactive process meeting was supposedly for on July 28, before the meeting took place on July 31.  [Ex 4 ADA meeting email]

28.  This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer.  DISPUTE.  Plaintiff claims that she should be reasonably accommodated by being allowed to telework for a period of the day after her migraine resolves, but the side effects of her medication prevent her from safely operating a motor vehicle.   [Plaintiff's 3rd Declaration]

29. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer.  Admit

30. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. Admit that Plaintiff submitted ADA paperwork seeking reasonable accommodation for her migraines on August 4, 2023.   DISPUTE that the interactive process meeting was about her migraine accommodation.  [Plaintiff's 3rd Declaration]

31. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer.  DISPUTE.  Defendant Moya called Plaintiff to tell her that her accommodation was being denied and a vague suggestion about darkening Plaintiff's office lights, which doesn't help Plaintiff perform her work duties, and isn't responsive to her actual request. [Plaintiff's 3rd Declaration]

32. DISPUTE.  Defendants have refused to produce evidence showing how many employees are teleworking.  Defendant Moya lied in her own deposition when she said she didn't know anyone teleworking.  [Doc. 100 Ex 1 pg 80]  She was allowed to telework as an accommodation while recovering from knee surgery but did not disclose this material fact in her deposition. [Doc 100 Ex 6 pg 200-201] Defendant LeBlanc has been allowed to telework for child care issues. [Doc. 100 Ex 9 pg 97] Jose Puentes, former Risk Management attorney worked from home but was required to characterize it as "off site training" or "Remote Office Work Site" [Ex 5 Jose Puentes Affidavit]

33. DISPUTE – Defendants have never communicated that working in person was an essential function of Plaintiff's position, or all GSD positions, and they allow some employees to telework, both as an accommodation and for other reasons. [Plaintiff's 3rd Declaration]  [Doc 100 Ex 6 pg 200-201] [Doc. 100 Ex 9 pg 97] [Ex 5 Jose Puentes Affidavit]

34. DISPUTE – The exhibit being discussed in Defendants' citation was the denial of full time telework accommodation which Plaintiff did not seek.  It is not related to her request to telework occasionally, and that denial did not include any communication about working in Santa Fe.  Plaintiff worked remotely both for Covid and as an accommodation for over 3 years she worked for Defendants.  Defendants do not include any hard evidence of any "requirement" for Plaintiff to work only in Santa Fe. [Plaintiff's 3rd Declaration]

35. DISPUTE.  This is pretextual and evidence of shifting explanations.  Defendant employees worked for years from home, and some continue to be allowed to telework. There is no extrinsic evidence of any concern about supervision and others have

worked from home with no issue. [Doc 100 Ex 6 pg 200-201] [Doc. 100 Ex 9 pg 97] [Ex 5 Jose Puentes Affidavit] [Plaintiff's 3rd Declaration]

36. Admit.  Plaintiff worked for 3 years in her home office with no issue.

37. Admit but not material or relevant to GSD's duty to accommodate its disabled employees.

38. DISPUTE - it does not specify physically in person

39. This fact is improperly compound, includes multiple facts, is impossible to properly answer and in violation of D.N.M.LR.56.1. DISPUTE none of the specify that these requirements are physically in person in a specific location.

40. Admit.  Plaintiff is under no obligation to disclose her disability when applying or interviewing for a new position, and it's legally problematic that Defendants ask potential employees about their need for accommodations before offering them a job as it might encourage an applicant to disclose a disability pre-offer.

41. Admit

42. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer.   Admit she applied.

43. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer.  DISPUTE – Plaintiff is extremely familiar with the procurement process. [Plaintiff's 3rd Declaration]

44. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. Admit.

45. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer.  DISPUTE  Plaintiff has a higher education than Defendant LeBlanc.  [Plaintiff's 3rd Declaration]

46. Admit

47. This fact is improperly compound, includes multiple facts is impossible to properly answer and in violation of D.N.M.LR.56.1  Admit

48. This fact is improperly compound, includes multiple facts is impossible to properly answer and in violation of D.N.M.LR.56.1  Admit

49. Admit

50. This fact is improperly compound, includes multiple facts, is impossible to properly answer and in violation of D.N.M.LR.56.1  This is supported by a self-serving affidavit.

51. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer.  Dispute – Mr. Fisher had no state procurement experience at all.  [Plaintiff's 3rd Declaration]

52. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer.  DISPUTE Amber Sanchez did not meet the minimum qualifications for the position, which required a high school diploma and 8 years of experience with government contracts/purchasing.  In her interview, she stated she had 6 years of procurement experience. Amber Sanchez interview panel notes. [Ex 6] [Ex 7] [Ex 8]

53. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. DISPUTE.  Francine Martinez was Amber Sanchez's reference, and therefore had a conflict of interest. [Sanchez app]

9

DISPUTE Plaintiff was actively prevented from getting IT procurement experience while Francine Martinez gave Amber Sanchez IT procurements to work on, even though she was not even a buyer. [Ex 9 ] [Ex 10]

54. Not material -Admit

55. DISPUTE.  This supposed fact is not only not material, but cites to inadmissible evidence purporting to know what was in Plaintiff's mind.  Plaintiff applied for each position because she was interested in them. [Plaintiff's 3rd Declaration]

56. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. DISPUTE – The interviewers knew that Plaintiff had been granted telework accommodation after they returned to the office in 2023. [Plaintiff's 3rd Declaration]

57.  DISPUTE – Defendants chose two less qualified, younger candidates over Plaintiff and other older applicants.

58. DISPUTE – Defendants have repeatedly hired younger candidates for their IT Procurement positions, passing over older, more educated and experienced applicants.

59. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. Not material. DISPUTE Plaintiff discussed flexing her time with her manager in a weekly meeting, and believed she had permission. [Defendants Exhibit A pg 139 ln 17-21] Admit that she forgot to put in the leave slip until the day before.

60. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. Not material.

61. This fact is improperly compound, includes multiple facts in violation of D.N.M.LR.56.1 and is impossible to properly answer. Not material.  DISPUTE, Defendants misrepresented FLSA requirements to Plaintiff which do not exist, telling her that she FLSA prohibits her from working after a certain time each day or else they would have to pay her OT.

62. Admit that Defendants told Plaintiff that they would not pay her for the time she had worked for this reason.

63. Admit.

## Plaintiff's Additional Material Facts

Plaintiff incorporates by reference herein her undisputed material facts from her two Motions for Partial Summary Judgment [Docs 99 and 100]

A. Defendants admitted that they made a mistake in not timely certifying Plaintiff's FMLA in 2023.  [Doc. 99 Ex 18] [Doc. 99 Ex 16 pg 112]

B. Defendants admitted that they mistakenly did not allow at least 15 days before denying Plaintiff's FMLA leave in 2024. [Doc. 99 Ex 16 pg 192]

C. "Whether a diagnosis is included in the certification form is left to the discretion of the health care provider and an employer may not reject a complete and sufficient certification because it lacks a diagnosis." [Doc. 99 Ex 3]

D. Plaintiff gave notice of her need for FMLA leave on March 1 2023 at 8:03am.  [Doc 99 Ex 6 March 1 texts pg 1]

E. Defendants marked Plaintiff AWOL and denied her paid leave on March 1. [Doc. 99 Ex 7 designated AWOL]

11

F.  GSD Employees will be subject to "disciplinary action up to and including dismissal" for being AWOL.  [ Doc. 99 Ex 8 Attendance and Leave Policy 6.5.7]

G.  GSD Policy states "Any employee with a poor attendance record, excessive tardiness, numerous and frequent short-term absences, a history of one-, two- and three-day illnesses, or frequent emergencies which occur on the day before or after scheduled or approved days off or which precede or follow holidays, use of leave immediately upon accrual, thus maintaining zero or near-zero leave balances, may be subject to disciplinary action, up to and including dismissal." [Doc. 99 Ex 8. Attendance and Leave 6.1.5]

H.  Plaintiff was denied FMLA leave on 15 different days from January through March 2023. [Ex 2]

I.  Plaintiff was denied FMLA leave on 8 different days in March and April 2024.  [Doc. 99 Ex 21]

J.  Plaintiff had to retain an attorney who had to send several letters to Defendants before Defendants finally admitted that Plaintiff's certification had been complete when she first submitted it in January 2023, and certified her FMLA on March 30, 2023.  [Plaintiff's 3rd Declaration]

K.  After being marked AWOL Plaintiff was afraid to try to take FMLA leave and did not take leave she otherwise would have taken. [Plaintiff's 3rd Declaration]

L.  Plaintiff was prejudiced by Defendants' interference in 2023. [Plaintiff's 3rd Declaration]

M.  Plaintiff was working from home during all of the FMLA interference in 2023, and was not found to be not in attendance or to not be reporting to work, outside of her denied FMLA covered absences. [Plaintiff's 3rd Declaration]

N. Eunice Moya, HR Director, oversaw Kelly Howley and Defendant Morfin's work and communications with Plaintiff, and made the ultimate decisions in all of Plaintiff's FMLA allegations. [Plaintiff's 3rd Declaration]

O. Plaintiff's mother was dying in hospice in March 2024. [Plaintiff's 3rd Declaration]

P. Defendants' response to Plaintiff's Interrogatory #8 states "GSD states that since August 2023, no employee has been authorized for regular telework" [Ex 16]

Q. Jose Puentes was employed at GSD as an attorney in the Risk Management Division. He worked from home regularly throughout 2023 and 2024, but was required to characterize it as "off site training" or "Remote Office Work Site" [Jose Puentes Affidavit]

R. Both the CWA and the AFSCME collective bargaining agreements require Defendants to provide alternative worksite accommodations even for a temporary medical condition.

S. Defendant Moya testified that there was no individualized assessment when considering Plaintiff's request for accommodation to telework on an occasional basis. [Doc 100 Ex 1 pg 90 ln 1-17]

T. GSD's non-mandatory telework policy does not purport to modify the essential functions of all GSD positions and did not apply to requests for reasonable accommodation. [Doc. 100 Ex 7]

U. Plaintiff applied multiple times for open IT procurement positions because she was qualified and interested in them [Plaintiff's 3rd Declaration]

V. Plaintiff was actively prevented from gaining IT procurement experience, and was honest about the fact that she did not have direct IT procurement experience in her interviews. [Plaintiff's 3rd Declaration] [Ex 9]

13

W.  Defendant Martinez gave instructions that Plaintiff was not allowed to work on any IT procurements, and was prevented from gaining experience in IT procurements. [Ex 9]

X.  Andric Fisher had no degree, no state procurement experience, was not a NM resident, and was younger than the other applicants. [Ex 11 Fisher app]

Y.  NM State is required to give NM residents preference in hiring for state positions.  [Ex 12 NMAC 1.7.5.11] [NMSA 1978 § 10-9-13(c)]

Z.  IT Procurement Position # 2972 and 49191 both required a minimum of a Bachelor's Degree and 4 years of experience with government contracts with an emphasis in IT.

AA. Tami Concha applied for position #2972, was interviewed, and was not selected.  She is 53 or 54. [Plaintiff's 3rd Declaration]

BB. James Ortega applied for Position 2972 and 49191 and was interviewed for both. [Ex 13 and 14]

CC. His listed work experience begins at Xerox in 1990, making it substantially likely that he is over 50 years of age. [Ex 14 GSD009520]

DD. James Ortega had an associates degree and had worked in State procurement since 2012, giving him 12 years of direct experience.  [Ex 14 GSD009516-21]

EE. One of his previous titles was "Purchasing Supervisor IT Procurement" [Ex 14 GSD009518]

FF. In addition to Plaintiff, two other SPD employees were also interviewed for #49191: James Ortega and Amber Sanchez.

GG. Plaintiff was 62 at the time of the application and interview.

HH. Ms. Sanchez was approximately 37 when she applied for, was interviewed and hired for IT Procurement Specialist II #49191

14

II.   Ms. Sanchez has a high school diploma. [Ex 15]

JJ.   Plaintiff has an MBA and had 7 years of experience. [Plaintiff's 3rd Declaration]

KK.   In the substitution table for position #49191, if an applicant had a Master's degree, they only needed 2 years' experience. If an applicant had an associate's degree, they needed 6 years of experience. If an applicant had a high school diploma, they would need 8 years of experience to meet the minimum qualifications.  [Ex 17]

LL.   Ms. Sanchez had worked for almost 6 years at state purchasing, 2 years as a buyer and 4 years as a compliance officer.

MM. Ms. Sanchez misrepresented that she met the minimum qualifications for the 49191 position and had 7 to nine years with the ITB/RFP Process, over 10 years of experience with the NM Procurement Code and processing IT contracts.  [Ex 15]

NN.   Prior to her state career, Ms. Sanchez worked as a branch manager for a private personal loan company called Regional Finance.  [Ex 15]

OO.   The Branch Manager Job description at Regional Finance doesn't include any state procurement job duties, work with the state procurement code, or IT contract procurements. It is a private corporation. [Ex 18]

PP.   Francine Martinez was one of 3 references for Amber Sanchez on the 49191 application and also was on her hiring panel which creates an appearance of impropriety and bias. [Ex 15]

QQ.   Plaintiff worked as a compliance officer at State Purchasing and did not claim all the IT procurement experience that Ms. Sanchez claimed to have gotten.  [Plaintiff's 3rd Declaration]

15

RR. Compliance officers are not buyers, and do not do procurements as part of their duties. [Plaintiff's 3rd Declaration]

SS. Although Ms. Sanchez was a compliance officer and not a buyer, Francine Martinez assigned her work on an IT procurement, which gave her direct experience in IT procurements. [Ex 10]

TT. Francine Martinez decided that Ms. Sanchez should be hired for the #49191 position over Plaintiff. [Defendants' Ex. D]

UU. When hired as an IT Procurement Specialist, she went from $68,319.95 to $97,952.40 a year, which is a 43% raise, requiring special approval from SPO for anything over 15%. [Ex 19]

VV. SPO did not compare Ms. Sanchez's qualifications against the other applicants when approving [Ex 20]

WW. Plaintiff earned $175.90 less during the pay period from 2/18/23-03/03/23 than the previous pay period because of having to take an unexpected unpaid day off. [Doc 99 Ex 25]

## I.    FMLA Interference

A plaintiff on an FMLA interference claim must establish the following: (1) that he was entitled to FMLA leave; (2) that some adverse action by the employer interfered with his right to take FMLA leave; and (3) that the employer's action was related to the exercise or attempted exercise of his FMLA rights. *Dalpiaz v. Carbon County*, 760 F.3d 1126, 1132 (10th Cir. 2014)

*Gambro v. Campbell Healthcare, Inc*., 478 F.3d 1282, 1287 (10th Cir. 2007), citing *Jones v. Denver Pub. Schs*., 437 F.3d 1315, 1318 (10th Cir. 2005). The employer bears the burden of proof on the issue of whether the employer's actions were related to the exercise or attempted exercise of the employee's FMLA rights where the employee has shown some adverse action interfering with the right to use FMLA leave. *Dalpaz*, 760 F.3d at 1132; *Gambro*, 478 F.3d at 1287; *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006).

Where an employer interferes with the employee's right to FMLA leave, the deprivation constitutes a violation of the FMLA regardless of employer intent. *Brown v. ScriptPro, Inc.*, 700F.3d 1222, 1226-27 (10th Cir. 2012); *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955,960 (10th Cir. 2002). Under an interference theory, the employee must simply demonstrate an entitlement to the disputed leave. *Smith*, 298 F.3d at 960. The McDonnell-Douglas framework is not applicable to FMLA interference claims. *ScriptPro, Inc.*, 700 F.3d at 1226-27. Consequently, a pretext analysis is not necessary in determining FMLA interference claims. Id. at 1228.

As an initial matter, Defendants rely heavily on *Rodriguez-Ortega v. Rich, et al*, 1:21-cv-1129 JCH/KK (D.N.M.)(September 26, 2024).  That case is one of undersigned counsel's other cases.  Problematically, the FMLA decisions in that case are currently pending appeal in the 10th Circuit[1].  In that case, the Court misapprehended the fact that Defendants had actual notice that Plaintiff was incapacitated in the hospital by his FMLA qualifying conditions on the very first day he was absent and they marked him AWOL, and that Plaintiff was protected by the FMLA even if he hadn't been able to give notice right away.  Since the case is currently under review and may be reversed, this Court should exercise caution in relying upon it. Even notwithstanding

---

[1] Oral argument has just been set for November 20, 2025

the potential problems with citation to that case, it just doesn't apply here.  In *Rodriguez-Ortega*, there was a question of whether the notice of absence was timely and/or whether the Plaintiff in that case had to comply with employer notice requirements even when he was hospitalized for emergency treatment.

Here, the entire issue in 2023 is that Defendants were unlawfully rejecting Plaintiff's FMLA certification, and denying her the right to FMLA protected leave. In 2024, they began to artificially limit the number of times Plaintiff was allowed to take FMLA, and immediately began denying leave in excess of that number.  On both occasions she was very literally told that she could not invoke FMLA for the leave in question.  Instead, she was forced to take LWOP, even when she had paid leave available. LWOP is at the discretion of her managers, who could, and did, deny her that approved unpaid leave and marked her AWOL instead.

There is no dispute that Plaintiff timely gave notice of her need for leave for every absence, nor was Plaintiff hospitalized at any point.   Summary Judgment should be granted to Plaintiff on her FMLA claims as there is no legitimate dispute that Defendants refused to authorize FMLA leave because of their own ignorance of the certification process.  Defendants admit that they made mistakes with Plaintiff's FMLA administration, which interfered with Plaintiff's FMLA rights, and she was materially prejudiced by that interference costing her pay and resulting in the expense of retaining legal counsel.

Specifically on March 1, 2023, she sent the initial text message at 8:03am which is in compliance with employer notice requirements.  When it was clear she would not be in at all and was incapacitated, her husband gave notice. The FMLA explicitly allows indirect notice. Defendants were interfering with Plaintiff's FMLA and refused to allow her to designate the absence as FMLA protected.  They also refused to let her used paid leave that day, forcing her to

18

take LWOP and marking AWOL.  Being forced to take an unpaid absence instead of a paid absence is an adverse action.  Being marked AWOL, which Defendants own policy stated will be subject to additional discipline, is also an adverse action.  Plaintiff had 26.83 hours of annual leave available to her that day.  She had 16 hours of personal leave available to her that day.  She had 3.87 hours of sick time.   But she was forced to take LWOP and AWOL instead of using her paid leave.

Defendants contend that the "undisputed facts" are that Plaintiff submitted her renewal and GSD HR told her the documents needed more information.  But what Defendants fail to mention to the Court is that they were wrong. The documents were not missing information, and Defendants were interfering with Plaintiff's FMLA by imposing unlawful and imaginary additional requirements on her certifications.  Plaintiff had to take time off of work to get a 2nd certification, and likely pay another copay, to get another certification that she never needed. Defendants have admitted that they made a mistake in not immediately recertifying Plaintiff's leave in 2023.  It's disingenuous for them to try to argue now that they did nothing wrong.

As they admit, it took them until the end of March 2023, to finally certify Plaintiff's 2023 FMLA year.  That's 2.5 months after Plaintiff submitted her application.  Defendants appear to argue that Plaintiff can't meet the second element required for an interference claim, but this is just patently false.  "In order to satisfy the second element of an interference claim, the employee must show that she was prevented from taking the full 12 weeks' of leave guaranteed by the FMLA, denied reinstatement following leave, or **denied initial permission to take leave**." *Campbell v. Gambro Healthcare, Inc*., 478 F.3d 1282, 1287 (10th Cir. 2007)(emphasis added). There is absolutely no legitimate dispute that Plaintiff was repeatedly denied initial permission to take FMLA leave.  She was explicitly told that she couldn't "invoke" FMLA leave because her

19

FMLA year expired in December, while Defendants spent months unlawfully rejecting her medical certification.

There can be no dispute that Plaintiff being denied her right to take FMLA protected leave is related to the exercise of her FMLA rights.  There can also be no dispute that being marked AWOL and denied the use of available paid leave was related to the exercise of Plaintiff's FMLA rights because Defendants eventually retroactively designated that day as unpaid FMLA, still denying Plaintiff paid leave for that day.

In 2024, Defendants interference was even worse, and they have admitted that they messed up.  They were already on notice to be careful with Plaintiff's FMLA because she was already suing them in federal court.  But that didn't seem to encourage them to comply with the law at all.  First, Defendants incorrectly applied their own policy and refused to grant Plaintiff FMLA leave on January 26, 2024, unlawfully claiming that the provider's estimated dates controlled when Plaintiff's FMLA year began, rather than it beginning on the first date she took protected leave. But then, a month later, they arbitrarily decided that Plaintiff's medical provider's estimate was a guarantee and represented a hard limitation of Plaintiff's right to leave. Plaintiff's provider had used the same estimate in past years, and it had never been enforced as a limitation.  In fact, Plaintiff took FMLA leave 5 times in February 2024, and Defendants didn't say anything about it.

But suddenly, on March 11, 2024, Defendants Moya and Morfin told Plaintiff she couldn't take more than 4 days each month.  Defendant Morfin's email states that Plaintiff would have to "reapply" for FMLA, which is not accurate.  But even interpreting that as a request for recertification, Defendants must allow at least 15 days for Plaintiff to obtain a recertification if practicable.  If, despite Plaintiff's good faith attempts, she cannot obtain the recertification in 15

days, Defendants must give her longer.  Yet, Defendants began denying Plaintiff FMLA leave only 7 days after arguably asking for recertification. Even after Plaintiff gave them notice that she couldn't get an appointment with her provider until the end of April, Defendants continued to deny her leave.  This constituted illegal interference with Plaintiff's federal rights.

If that wasn't bad enough, they also invented the requirement that Plaintiff couldn't use donated paid leave she had available UNLESS she was using FMLA for that absence.  So Defendants not only denied Plaintiff her federally protected leave, but they punished her for taking leave at all by forcing those absences to be unpaid.  And this was all while Plaintiff's mother was actively dying in hospice, a fact known to Defendants.  After her mother passed at the end of March/early April, Plaintiff was granted a week of unpaid bereavement leave.  Yet when she returned, Defendants went right back to denying her FMLA leave and refusing to let her use donated leave.  Like in 2023, Plaintiff was very literally denied permission for FMLA leave. She was discouraged from taking more than 4 FMLA instances a month by having to take unpaid time for those absences.  It is patently false that Defendants claim that Plaintiff has lost no pay.

The only similarity between *Rodriguez-Ortega* and this case is the fact that neither GSD nor DOH requires or provides <u>any</u> training for their HR employees regarding how to administer the FMLA, and both HR departments just make up rules and requirements as they go.  As argued in her own MSJ, Defendants clearly interfered with Plaintiff's FMLA and it is appropriate to grant summary judgment in Plaintiff's favor on this claim.  Defendants repeatedly denied Plaintiff FMLA leave, and forced her to take unpaid leave when she otherwise had paid leave available to her.  She had a right to 480 hours of protected FMLA leave, Defendants repeatedly

denied that leave and prohibited her use of available paid leave, and Defendants unlawful denial

of her leave was indisputably related to the fact she was trying to take FMLA leave.

## II.    Telework is a Reasonable Accommodation for Plaintiff's position

In many instances, teleworking is often a reasonable accommodation.  See *Ali v. Regan*,

467 U.S. App. D.C. 539, 554, 111 F.4th 1264, 1279 (2024) (remote work may well be a

reasonable accommodation in many cases) This turns on whether the employee can perform

the essential functions with that accommodation. *Id. at* 1280. ("[L]ike many accommodation

judgments, the reasonableness of a telework accommodation turns on whether it will enable a

specific employee 'to perform the essential functions of [her] position' in a specific

workplace.]

Notably, Defendants heading describes their misapprehension of their legal duty, and the

law surrounding it.  They say "Plaintiff is not entitled to work from home."  This case is not

about entitlement, it's about reasonable accommodation. Defendants have a clear duty to

accommodate their disabled employees.  Plaintiff IS entitled to reasonable accommodation of

her disability, and the fact here is that Defendants not only refused to allow her to telework

on an occasional basis, but they have continued to refuse to even work towards finding any

other potential accommodations.

The question is ONLY whether telework is reasonable to assist Plaintiff in the

performance of her job duties. The answer is yes. The fact that Defendants frame it as an

issue of entitlement suggests that they view Plaintiff's request as undeserved and a benefit far

above her lowly position.  This is highly problematic.

But Defendants cannot, and do not, argue that Plaintiff's individual job requires in person work. Instead, without analysis, they claim that every single position at GSD must be done in person only, and they attempt to deceive Plaintiff and this Court by claiming that no one ever teleworks. There is significant evidence that that is not true, as two of the named Defendants have themselves been allowed to telework. Critically, Defendants have refused to produce records showing how many of their employees are working from remote locations such as their homes. However, the number of employees who have been found to be teleworking contrary to Defendants' claims that no one does, has continued to grow. Interestingly, even while employees have admitted that they have worked from home they have recorded their time as either normal worked time instead of coding it as telework, and/or calendared it vaguely as remote offsite work. This suggests that Defendants are trying to obscure who is teleworking, where they are working from, and how often they are working remotely.

Defendants appear to believe that they can unilaterally prohibit telework as an accommodation based on their (newly expressed) decision that everyone must work in person. This is completely contrary to the law, and their own policy, which promises to evaluate requests for accommodation on a case by case basis. They cannot do that if they insist on refusing to even consider a certain accommodation, not because it is an undue burden, but simply because they believe they can just not allow it. While certain positions may legitimately not be able to telework, Plaintiff's is not one of them.

23

**A.  100% in person work is not an essential function of Plaintiff's position.**

The Tenth Circuit has held "Evidence considered in determining whether a particular function is essential includes: (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the work experience of past incumbents in the job." *Mason v. Avaya Communs., Inc*., 357 F.3d 1114, 1119 (10th Cir. 2004)(quoting 29 C.F.R. § 1630.2(n)(3)).

While the employer's say so is one of the elements, it is not the only element and can be disproven.  "To be sure, physical presence in the office does not become an essential function of Brown's job simply because the Agency says so. For instance, Brown could show that the Agency's view was not 'job-related, uniformly enforced, [or] consistent with business necessity.'" *Brown v. Austin*, 13 F.4th 1079, 1086 (10th Cir. 2021)(quoting *Mason*)

Here, Defendants are not arguing that Plaintiff's specific job has the essential function of in person attendance.  They are, instead, arguing that they have suddenly decided that ALL positions at GSD have a non-modifiable in person requirement and that as a result they have no duty to offer telework to any employee for any reason.  However, Defendants cannot possibly meet the required elements to prove that all GSD employee positions have the non-modifiable essential function of physical in person work. They also cannot meet them for Plaintiff's specific position.

The Court should already take the first element with a grain of salt if it is considered at all, as these shifting explanations are evidence of pretext.   Plaintiff had been teleworking full

24

time for over 3 years when Defendants denied her request to telework on an occasional and intermittent basis. The first two years the teleworking was in response to the Covid pandemic, but beginning in January 2023, Plaintiff was granted a reasonable accommodation to telework full time due to being high risk for Covid. However, at the end of July 2023, Defendants decided that Plaintiff's accommodation was being cancelled and she would have to return to the office because of the recission of the non-mandatory telework policy.

The record shows that their entire reason for denying accommodation was that they no longer had a non-mandatory telework policy and therefore were unable to grant the accommodation, not that Plaintiff's job specifically required her to work in person and that it could not be performed remotely for any amount of time at all. There is nothing anywhere in Plaintiff's personnel file or her job description that identifies that physical attendance as an essential function of her specific job. As discussed herein, there are numerous inconsistencies about this claim and Defendants cannot show it is job-related, uniformly enforced, [or] consistent with business necessity. In fact, the clear record shows that it's not uniformly enforced and both disabled and non-disabled employees are allowed to telework, even if they record the time as something other than telework. Defendants' claim that no one teleworks and that all GSD employees have the same essential function of in person attendance is simply not true. The fact that Defendants are arguing that ALL GSD employees have that same essential function demonstrates that there is no nexus between the individual job requirements or the business needs and what each job's duties actually are. Defendants simply want to use this argument to escape their legal duty to accommodate their disabled employees.

2) As far as the second element, the job posting for Plaintiff's current position stated that the conditions of her employment are "Working Conditions for individual positions in this

25

classification will vary based on each agency's utilization, essential functions, and the recruitment needs at the time a vacancy is posted. **All requirements are subject to possible modification to reasonably accommodate individuals with disabilities.**"(emphasis added) Even IF Defendants could show that working in person was an essential function, they committed in writing to make ALL requirements, including all essential functions, subject to possible modification as a reasonable accommodation when they hired Plaintiff for this position. They cannot now argue that working in person is somehow sacrosanct and impossible to modify. In addition, there is no mention anywhere in Plaintiff's job description of working in person in Santa Fe being an essential function, nor is there any record of this explicitly being communicated to her as a reason for denying her intermittent accommodation.

3) Working in person is not really a "function" of Plaintiff's job. Plaintiff is not public facing and does not greet the public in her office. Plaintiff does not meet with clients in person, and they do not come to her office, and there is no work she performs that can only be performed in her Santa Fe office. Plaintiff is not asking to telework full time. She will continue to come to work in person most of the time even when she is granted reasonable accommodation. Defendants' failure to accommodate Plaintiff actively prevents her from performing ANY functions of her position as she is forced to be absent from work using FMLA leave when she could otherwise work.

4) There are no consequences of not requiring Plaintiff to work in person 100% of the time. There are no critical functions of Plaintiff's position that she performs as a direct result of being in person. Even when she's in the office, her meetings with her supervisor are done remotely through Teams. But there are, and have been, consequences from failing to accommodate her. While she is not being accommodated, Plaintiff is forced to be absent from

work and her work does not get finished on time.  It is much better for Defendants and the public if Plaintiff is allowed to work as much as possible so that agency needs are met as efficiently as possible.  Defendants testified that there is a big shortage of CPOs in the State of New Mexico, so they should be doing what they can to retain Plaintiff, and to enable her to work as much as she is able, instead of forcing her to take leave when she could otherwise work.

5) Plaintiff herself teleworked after the Covid pandemic as a reasonable accommodation. She was granted full time telework as an accommodation on a "trial" basis after everyone else returned to work and was not part of the non-mandatory telework policy which had already been rescinded. She was granted this accommodation because her disabilities placed her at higher risk, but never in that accommodations process did Defendants express any concern or otherwise communicate any belief that Plaintiff's job required in person work as an essential function. While teleworking during Covid may not be evidence of the ability for a position to be performed remotely, doing so <u>after</u> the Covid emergency passed likely is.  It demonstrates that all of Plaintiff's job duties can be performed remotely on a full-time basis, even while others are working in office, and that Defendants can, and have, accommodated employees including Plaintiff via telework.   And, Defendant Paulk testified to the fact that all of Plaintiff's job duties can be performed remotely.

**<u>Job-related, uniformly enforced and consistent with business necessity</u>**

In *Brown v. Austin*, 13 F.4th 1079, 1086 (10th Cir. 2021), the Court deferred to the employer's judgment about a position requiring physical presence as an essential function because Plaintiff in that case could not show that it was not.   In contrast, here, Defendants are claiming that all positions at GSD require physical presence. While some positions, like janitorial staff,

undeniably require in person work as an essential function of that position.  But others, such as Plaintiff's position, do not require in person work to be able to perform the essential functions of that position.  Plaintiff can show that requiring her physical presence 100% of the time is not job related, that they do not uniformly enforce that requirement and that it's not consistent with business necessity to require her to be in person 100% of the time.  Defendants don't even require their other employees to be in the office 5 days a week or at the same time due to their Alternate Work Schedule policy.  Some employees work only 4 days a week, so they aren't doing their job from anywhere one day a week, and are completely absent.

Most importantly, Defendant Moya lied to cover up her own teleworking accommodation, and

Plaintiff has obtained testimony from Defendants regarding other employees being allowed to telework, such as Defendant LeBlanc has been allowed to telework when she has child care issues. Defendants have even paid other SPD employees' overtime in the past year or so to telework from home to catch up on work assignments, including other Purchasing Agents, but singled Plaintiff out and didn't allow her to earn any overtime when she requested to do so. Defendant Paulk testified under oath that Plaintiff could perform all of her job duties from home. Perhaps most importantly, Defendant Moya lied in her deposition claiming she didn't know anyone who had teleworked when she herself had been granted the reasonable accommodation of telework while recovering from knee surgery only a few months earlier.  She intentionally tried to obstruct evidence of the fact that Defendants DO allow telework even while she keeps testifying that they don't.  Another litigant who recently filed a lawsuit against GSD alleging civil rights violations during his employment states in his complaint that he worked from home after November 2023.  Defendants claim that no one is allowed to telework is simply not true, and it's likely there are many other GSD who have or do telework.

28

Plaintiff is not seeking a full time telework accommodation, only asking to work from home a few hours each month. Even if there were aspects of her job that must be performed physically in the office, she could easily perform those during the bulk of the time she was physically in the office.  Plaintiff knows of nothing that requires her physical presence in the Santa Fe office to perform, and certainly not 100% of the time. There simply is no business necessity attached to refusing to allow Plaintiff to telework as needed on an occasional basis.

### III.    Plaintiff's Age Discrimination Claims

A failure to promote claim is extremely fact intensive and therefore not well suited for summary judgment. What is clear from the evidence is that on two separate occasions, Defendants promoted the younger candidate over older candidates with more education and/or experience, even when state law required them to give state residents preference, or the candidate didn't even legitimately meet the minimum qualifications.  For job #2975, Defendants hired Andric Fisher, an external candidate with absolutely no NM state employment or procurement experience, when he wasn't a NM resident, over several older internal candidates with more education and/or state procurement experience and who were long time residents.  They ended up terminating him for sleeping on the job because he was not a good fit.

In Job # 49191, Defendants interviewed 3 internal candidates:  One approximately 37 years old with only a high school education and less than 6 years' experience, one over 50 with an associate's degree and about 12 years state procurement experience, and Plaintiff, who was 62, holds an MBA and had 7 years of state procurement experience.  Ms. Sanchez did not have the minimum years of experience in government contracts to substitute for the minimum requirements for the position, and stated in her interview that she had 6 years of procurement

experience.  The minimum she needed was 8. Defendant GSD testified that they counted her years working at a private personal loan company, even though a private loan company does not work with the state procurement code at all, and therefore Ms. Sanchez could not have obtained the required years of experience there.  The record also shows that Ms. Sanchez's manager, who was also her reference and one of the three hiring panel members, assigned her IT procurement tasks in her unrelated compliance position, thereby giving her an unfair advantage.  Conversely, the record shows that Plaintiff's managers expressly forbade her from being assigned any IT procurements and gaining any IT procurement experience.

Hiring Ms. Sanchez also cost taxpayers exponentially more than if one of the other two candidates had been promoted. Hiring Ms. Sanchez to the IT Procurement position was such a huge promotion that Defendants had to get special permission from SPO to hire/pay Ms. Sanchez such a 43% increase over her previous compensation, or $29, 632.45 more than her previous position[2].  Ms. Sanchez was not objectively better qualified than either of the other two candidates, and in fact her education, skills and experience were far inferior to both.  Defendants intentionally promoted the younger, less qualified candidate over Plaintiff.

## IV.    Plaintiff's Unpaid Wage Claim

Defendants take issue with the calculation of unpaid time, but they do not appear to take any issue with Plaintiff's argument that she worked time that she was never paid for.  Before amending this claim, Plaintiff requested that Defendants compensate her for her worked time, but they refused to do so, which necessitated her seeking compensation through the instant lawsuit.  It is legally irrelevant whether Plaintiff had prior approval to flex her time. Defendants

---

[2] She got another raise almost immediately to $106, 371.20 and currently earns $110, 626.05

must pay their employees for work performed for their benefit.  The only relevant, and completely undisputed fact, is that Plaintiff physically worked in service of Defendants for at least 7.5 hours on September 6, 2024.  However, her timesheet inaccurately reflects that Plaintiff worked only 6.75 physical hours, and that she had to use 1.25 hours of sick time.  The hours an employee physically works each year must be accurately recorded, as such hours are important for federal statutory rights such as FMLA qualification, when an employee must have physically worked 1280 hours in the preceding year to qualify for FMLA benefits. Plaintiff should have been given full credit for the 7.5 hours of physical time she worked, and made to take only 30 minutes of sick time that day.  Instead, she effectively had to <u>pay to work</u> 45 minutes of time, after having already physically worked that time, and did not receive compensation for it.  It is a violation of NM law to refuse to pay an employee for time they worked in service of their employer. Plaintiff should be compensated for .75 hours of time, and be reimbursed .75 hours of paid sick time.

## <u>Conclusion</u>

For the reasons argued herein, Plaintiff respectfully requests that this Court deny Defendants' Motion for Summary Judgment, award costs for the briefing of this response, and for whatever other relief this Court finds proper.

Respectfully Submitted.

Heather Burke
Attorney at Law
1000 Cordova Place #24

31

Santa Fe, NM 87505
(505) 428-9424
heather@hburkelaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed to be served upon opposing counsel of record through the Court's e-file and serve system on this 2nd day of September 2025.

Respectfully Submitted.

Heather Burke
Attorney at Law
1000 Cordova Place #24
Santa Fe, NM 87505
(505) 428-9424
heather@hburkelaw.com

32